# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BRAD PINZER and ERIKA PINZER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action: 3:23-cv-2639 |
| | § | |
| | § | With Jury Demand Endorsed |
| EQUIFAX INFORMATION SERVICES LLC, | § | |
| EXPERIAN INFORMATION SOLUTIONS, | § | |
| Inc., TRANS UNION LLC, NATIONSTAR | § | |
| MORTGAGE LLC, successor by merger to | § | |
| PACIFIC UNION FINANCIAL, LLC, and | § | |
| MIDFIRST BANK, | § | |
| | § | |
| | § | |
| Defendants. | § | |

---

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs, Brad and Erika Pinzer ("Plaintiffs"), by and through counsel, for their Complaint against Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, Nationstar Mortgage LLC, successor by merger to Pacific Union Financial, LLC and MidFirst Bank, jointly, severally, and in solido, states as follows:

## I. INTRODUCTION

1.      Three of the Defendants are consumer reporting agencies ("CRAs") as defined by 15

U.S.C. § 1681a(f), and Defendants, Nationstar Mortgage LLC, successor by merger to Pacific Union Financial, LLC and MidFirst Bank are furnishers of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiffs seek to recover from Defendants actual, statutory, and punitive damages, injunctive relief, legal fees, and expenses.

## II.  PARTIES

2.      Plaintiffs, Brad and Erika Pinzer, are natural persons residing in Milwaukee County, Wisconsin, and are "consumers," as defined by the FCRA, 15 U.S.C. § 1681a(c)**,** and is a victim of repeated  false credit reporting.

**Made Defendants herein are**:

3.      Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.  Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4.      Upon information and belief, Defendant Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," or "CRA

Defendant," or "CRA Defendants," is an Ohio corporation that does business in this judicial district and may be served by delivering a summons to its headquarters, 475 Anton Blvd., Costa Mesa, California 92626. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5.     Upon information and belief, Defendant Trans Union LLC, which may also hereinafter be referred to as "Trans Union", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6.     Upon information and belief, Defendant Nationstar Mortgage LLC, successor by merger to Pacific Union Financial, LLC or Mr. Cooper, which may also hereinafter be referred to as "Pacific Union/Nationstar," "Nationstar," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Delaware limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its

headquarters, 8950 Cypress Waters Blvd., Coppell, Texas 75019. Nationstar is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7.      Upon information and belief, Defendant MidFirst Bank which may also hereinafter be referred to as "MidFirst," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Oklahoma Corporation, that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 11001 North Rockwell Avenue, Oklahoma City, OK 73162. MidFirst is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

8.      As used herein, "consumer reporting agency," or "CRA," means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as "credit reports") to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting, maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically include, but are not limited to, Equifax, Experian, and TransUnion.

### III. JURISDICTION AND VENUE

9.      Plaintiffs respectfully assert that this Honorable Court has jurisdiction in this case arises under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiffs also assert actions under states' laws which may be brought within the supplemental jurisdiction of this

Court and Plaintiffs respectfully request that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

10.    Venue is proper in this District, because CRA Defendants and Nationstar transact business in this District. Nationstar's headquarters is located in this judicial district, a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiffs' claims against Defendants occurred in the Northern District of Texas as further described. 28 U.S.C. § 1391.

11. Venue is further proper in this District, because CRA Defendants entered into agreements with Nationstar in this judicial district to receive credit reporting data concerning Plaintiffs. Any and all requests to investigate Plaintiffs' disputes sent from the CRA Defendants as part of their reinvestigation was submitted to Nationstar's headquarters and investigated by the furnisher Nationstar using Nationstar's resources located at or closely connected to this judicial district. Nationstar managed Plaintiffs' mortgage from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

## IV.  FACTUAL ALLEGATIONS

12.    Upon information and belief, in or around June 2015 Plaintiffs secured a mortgage for their property located at 1540 Franklin Ave., Unit B, River Forest, IL 60305.

13.    Sometime thereafter, Pacific Union Financial, LLC acquired Plaintiffs' mortgage loan and assigned loan number 836000097xxxx, hereinafter ("Pacific Union mortgage account").

14.    On January 23, 2018, Plaintiffs jointly filed for a Chapter 13 bankruptcy. A redacted

copy of Plaintiffs' chapter 13 bankruptcy docket report is attached hereto as Exhibit "A".

15.    On April 24, 2018, Plaintiffs' Chapter 13 payment plan was confirmed. *See* Exhibit "A".

16.    Sometime during the bankruptcy, Pacific Union was sold, including all rights, liabilities, mortgage loan servicing responsibilities, and furnishing responsibilities, to Nationstar.

17.    Plaintiffs' Pacific Union Mortgage was included with the above referenced sale, and thus, was transferred to Nationstar and assigned a loan number of 65424xxxx (hereinafter "Nationstar Mortgage" or "Nationstar Loan").

18.    Soon after this acquisition, on or around October 11, 2019, Plaintiffs' Nationstar loan was then transferred to MidFirst Bank and MidFirst assigned loan number 5800xxxx, hereinafter "MidFirst Mortgage Account") *See* Exhibit "A".

19.    On November 19, 2019, the bankruptcy court authorized the Plaintiffs to sell the property and pay the MidFirst mortgage lien in full. A redacted copy of the Order on Motion to Use Sell or Lease Property 363(b) is attached hereto as Exhibit "B". *See also* Exhibit "A".

20.    On February 23, 2023, Plaintiffs were discharged form their chapter 13 bankruptcy. A redacted copy of Plaintiff's Chapter 13 Bankruptcy Discharge Order is attached hereto as Exhibit "C".

21.    Read in concert, Sections 1322(a)(2), 1322(b)(5), and 1328(a)(1) of the Bankruptcy Code, bar discharging home mortgage debts in a Chapter 13 Bankruptcy.

22.    Throughout Plaintiffs' Chapter 13 Bankruptcy, under direct or indirect order from the bankruptcy Trustee, timely monthly mortgage payments were made to the Pacific Union, Nationstar, and MidFirst  mortgage accounts until the property was sold and the mortgage lien

finally satisfied in favor of MidFirst.

23.    Sometime in June 2023, Plaintiffs obtained their three-bureau credit report and noticed that the Equifax, Experian, and Trans Union credit report(s) were not accurate. Redacted copies of Plaintiff Brad Pinzer's and Plaintiff Erika Pinzer's three-bureau credit reports are each attached hereto as Exhibits "D" and "E" respectively.

<u>Credit-Reporting Allegations Concerning the Pacific Union Mortgage Account</u>

24.    Within the Equifax and Trans Union credit reports Plaintiffs noticed that it reported the Pacific Union mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as derogatory, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured Pacific Union/Nationstar mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the Pacific Union/Nationstar Mortgage tradelines after the Bankruptcy was discharged. [1]

25.    Metro 2 guidelines require furnishers and CRAs to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from

---

[1] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are followed by both furnishers and CRAs.

26.    Within the Experian credit report Plaintiffs noticed that it reported the Pacific Union mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as potentially discharged through bankruptcy, as derogatory, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured Pacific Union/Nationstar mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the Pacific Union/Nationstar Mortgage tradelines after the Bankruptcy was discharged. [2]

27.    Metro 2 guidelines require furnishers and CRAs to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from

---

[2] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are followed by both furnishers and CRAs.

28.     On or about July 2023, Plaintiffs sent direct disputes to Equifax, Experian, and Trans Union, and requested that the CRA Defendants investigate the reporting of the Pacific Union mortgage account. Plaintiffs requested that under the FCRA, each CRA Defendant conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the Pacific Union mortgage account.

29.     Within these dispute letter, Plaintiffs described in great detail the issues and the misreporting following their respective bankruptcies and enclosed copies of either their bankruptcy docket report, trustee final report, and/or discharge order. Redacted copies of Plaintiffs' unsigned dispute letters sent to Equifax are attached hereto as Exhibit "F". Redacted copies of Plaintiffs' unsigned dispute letters sent to Experian are attached hereto as Exhibit "G". Redacted copies of Plaintiffs' unsigned dispute letters sent to Trans Union are attached hereto as Exhibit "H".

30.     Equifax received Plaintiff Brad Pinzer's dispute on July 23, 2023. A redacted copy of the Certified Mail Receipt and Proof of Delivery for Plaintiff Brad Pinzer's Equifax Dispute Letter is attached hereto as Exhibit "I".

31.     Upon information and belief, Equifax did not respond to Plaintiff Brad Pinzer's dispute.

32.     Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report

on October 5, 2023 and within the Equifax credit report he noticed that the Pacific Union tradeline continued to report the same inaccuracies. A redacted copy of Plaintiff Brad Pinzer's October 5, 2023 Three-bureau Credit Report is attached hereto as Exhibit "J".

33.    Equifax responded to Plaintiff Erika Pinzer on August 2, 2023 and concerning the Pacific Union tradeline it was hard to decipher. A redacted copy of Equifax's Response to Plaintiff Erika Pinzer is attached hereto as Exhibit "K".

34.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 5, 2023 and within the Equifax credit report she noticed that the Pacific Union tradeline continued to report the same inaccuracies. A redacted copy of Plaintiff Erika Pinzer's October 5, 2023 Three-bureau Credit Report is attached hereto as Exhibit "L".

35.    Equifax's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Pacific Union tradeline and gave no explanation as to why it failed to sufficiently update the Pacific Union Mortgage tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

36.    Equifax's responses were not the result of reasonable investigations into Plaintiffs' disputes for they did not adequately evaluate or consider Plaintiffs' information, claims, or evidence and failed to remedy the inaccuracies within the Pacific Union Mortgage tradelines.

37.    Plaintiffs sent very clear disputes, and yet Equifax made no changes to the disputed information, bankruptcy status, and/or account status.

38.    Equifax chose to "verify" false information from an unreliable source, failed to

correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Pacific Union account.

39.    Upon the Plaintiffs' request to Equifax for verification and addition regarding the Pacific Union mortgage account, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Equifax failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Equifax did not make any attempt to substantially or reasonably verify the Pacific Union Mortgage account.

40.    In the alternative, and in accordance with Equifax's standard procedures, Equifax failed to contact Nationstar, therefore, failed to perform any investigation at all.

41.    In the alternative to the allegation that Equifax failed to contact Nationstar, it is alleged that Equifax did forward some notice of the dispute to Nationstar, and Nationstar failed to conduct a lawful investigation.

42.    Experian received Plaintiff Brad Pinzer's dispute on July 22, 2023. A redacted copy of the Certified Mail Receipt and Proof of Delivery for Plaintiff Brad Pinzer's Experian Dispute Letter is attached hereto as Exhibit "M".

43.    Upon information and belief, Experian did not respond to Plaintiff Brad Pinzer's dispute.

44.    Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 4, 2023 and within the Experian credit report he noticed that the Pacific Union tradeline continued to report the same inaccuracies. *See* Exhibit "J".

45.    Experian received Plaintiff Erika Pinzer's dispute on July 22, 2023. A redacted copy

of the Certified Mail Receipt and Proof of Delivery for Plaintiff Erika Pinzer's Experian Dispute Letter is attached hereto as Exhibit "N".

46.    Upon information and belief, Experian did not respond to Plaintiff Erika Pinzer's dispute.

47.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 4, 2023 and within the Experian credit report she noticed that the Pacific Union tradeline continued to report the same inaccuracies. *See* Exhibit "L".

48.    Experian's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Pacific Union tradeline and gave no explanation as to why it failed to sufficiently update the Pacific Union tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

49.    Experian's responses were not the result of reasonable investigations into Plaintiffs' disputes for they did not adequately evaluate or consider Plaintiffs' information, claims, or evidence and failed to remedy the inaccuracies within the Pacific Union Mortgage tradelines.

50.    Plaintiffs sent very clear disputes, and yet Experian made no changes to the disputed information, bankruptcy status, and/or account status.

51.    Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Pacific Union account.

52.    Upon the Plaintiffs' request to Experian for verification and addition regarding the

Pacific Union mortgage account, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Experian failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Experian did not make any attempt to substantially or reasonably verify the Pacific Union Mortgage account.

53.     In the alternative, and in accordance with Experian's standard procedures, Experian failed to contact Nationstar, therefore, failed to perform any investigation at all.

54.     In the alternative to the allegation that Experian failed to contact Nationstar, it is alleged that Experian did forward some notice of the dispute to Nationstar, and Nationstar failed to conduct a lawful investigation.

55.     Trans Union responded to Plaintiff Brad Pinzer on August 4, 2023 and deleted the Pacific Union tradeline. A redacted copy of Trans Union's Response to Plaintiff Brad Pinzer is attached hereto as Exhibit "O".

56.     Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 4, 2023 and within the Trans Union credit report he noticed that the Pacific Union tradeline was indeed missing. *See* Exhibit "J".

57.     Trans Union responded to Plaintiff Erika Pinzer on August 4, 2023 and deleted the Pacific Union tradeline. A redacted copy of Trans Union's Response to Plaintiff Erika Pinzer is attached hereto as Exhibit "P".

58.     Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 4, 2023 and within the Trans Union credit report she noticed that the Pacific Union tradeline was indeed missing. *See* Exhibit "L".

59.     Trans Union's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Pacific Union tradeline and gave no explanation as to why it failed to sufficiently update the Pacific Union tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

60.     Plaintiffs sent very clear disputes, and yet Trans Union made no changes to the disputed information, bankruptcy status, and/or account status.

61.     Trans Union chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and inappropriately deleted  Plaintiffs' Pacific Union account.

62.     Upon the Plaintiffs' request to Trans Union for verification and addition regarding the Pacific Union mortgage account, and in accordance with Trans Union's standard procedures, Trans Union did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Trans Union failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Trans Union did not make any attempt to substantially or reasonably verify the Pacific Union Mortgage account.

63.     In the alternative, and in accordance with Trans Union's standard procedures, Trans Union failed to contact Nationstar, therefore, failed to perform any investigation at all.

64.     In the alternative to the allegation that Trans Union failed to contact Nationstar, it is alleged that Trans Union did forward some notice of the dispute to Nationstar, and Nationstar failed to conduct a lawful investigation.

Credit-Reporting Allegations Concerning the Nationstar Mortgage Account

65.    Within the Equifax and Trans Union credit reports Plaintiffs noticed that it reported the Nationstar mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as derogatory, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured Nationstar mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the Nationstar Mortgage tradelines after the Bankruptcy was discharged. [3]

66.    Metro 2 guidelines require furnishers and CRAs to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are

---

[3] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

followed by both furnishers and CRAs.[4]

67.    On or about July 2023, Plaintiffs sent direct disputes to Equifax and Trans Union, and requested that the CRA Defendants investigate the reporting of the Nationstar mortgage account. Plaintiffs requested that under the FCRA, each CRA Defendant conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the Nationstar mortgage account.

68.    Within these dispute letter, Plaintiffs described in great detail the issues and the misreporting following their respective bankruptcies and enclosed copies of either their bankruptcy docket report, trustee final report, and/or discharge order. *See* Exhibits "F" and "H".

69.    Equifax received Plaintiff Brad Pinzer's dispute on July 23, 2023. *See* Exhibit "I".

70.    Upon information and belief, Equifax did not respond to Plaintiff Brad Pinzer's dispute.

71.    Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 5, 2023 and within the Equifax credit report he noticed that the Nationstar tradeline was missing, presumably deleted despite being discharged from chapter 13 bankruptcy. *See* Exhibit "J".

72.    Equifax responded to Plaintiff Erika Pinzer on August 2, 2023 and concerning the Nationstar tradeline it was hard to decipher. *See* Exhibit "K".

73.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 5, 2023 and within the Equifax credit report she noticed that the Nationstar tradeline continued to report the same inaccuracies. *See* Exhibit "L".

---

[4] Notably, Plaintiffs' Experian credit report reported the Nationstar Mortgage Account accurately, with the correct updates and no bankruptcy indicators present.

74.     Equifax's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Nationstar tradeline and gave no explanation as to why it failed to sufficiently update the Nationstar Mortgage tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

75.     Equifax's responses were not the result of reasonable investigations into Plaintiffs' disputes for they did not adequately evaluate or consider Plaintiffs' information, claims, or evidence and failed to remedy the inaccuracies within the Nationstar Mortgage tradelines.

76.      Plaintiffs sent very clear disputes, and yet Equifax made no changes to the disputed information, bankruptcy status, and/or account status.

77.     Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, inappropriately deleted  Brad's and continued to publish the inaccurate information regarding Erika's Nationstar account.

78.     Upon the Plaintiffs' request to Equifax for verification and addition regarding the Nationstar mortgage account, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Equifax failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Equifax did not make any attempt to substantially or reasonably verify the Nationstar Mortgage account.

79.     In the alternative, and in accordance with Equifax's standard procedures, Equifax failed to contact Nationstar, therefore, failed to perform any investigation at all.

80.    In the alternative to the allegation that Equifax failed to contact Nationstar, it is alleged that Equifax did forward some notice of the dispute to Nationstar, and Nationstar failed to conduct a lawful investigation.

81.    Trans Union responded to Plaintiff Brad Pinzer on August 4, 2023 and deleted the Nationstar tradeline. *See* Exhibit "O".

82.    Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 4, 2023 and within the Trans Union credit report he noticed that the Nationstar tradeline was indeed missing. *See* Exhibit "J".

83.    Trans Union responded to Plaintiff Erika Pinzer on August 4, 2023 and deleted the Nationstar tradeline. *See* Exhibit "P".

84.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 4, 2023 and within the Trans Union credit report she noticed that the Nationstar tradeline was indded missing. *See* Exhibit "L".

85.    Trans Union's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Nationstar tradeline and gave no explanation as to why it failed to sufficiently update the Nationstar tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

86.    Plaintiffs sent very clear disputes, and yet Trans Union made no changes to the disputed information, bankruptcy status, and/or account status.

87.    Trans Union chose to "verify" false information from an unreliable source, failed to

correct the inaccurate information, and inappropriately deleted Plaintiffs' Nationstar account.

88.     Upon the Plaintiffs' request to Trans Union for verification and addition regarding the Nationstar mortgage account, and in accordance with Trans Union's standard procedures, Trans Union did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Trans Union failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Trans Union did not make any attempt to substantially or reasonably verify the Nationstar Mortgage account.

89.     In the alternative, and in accordance with Trans Union's standard procedures, Trans Union failed to contact Nationstar, therefore, failed to perform any investigation at all.

90.     In the alternative to the allegation that Trans Union failed to contact Nationstar, it is alleged that Trans Union did forward some notice of the dispute to Nationstar, and Nationstar failed to conduct a lawful investigation.

<u>Credit-Reporting Allegations Concerning the MidFirst Mortgage Account</u>

91.     Within the Equifax credit report Plaintiffs noticed that it reported the MidFirst mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured MidFirst mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the MidFirst Mortgage tradelines after the Bankruptcy was discharged. [5]

---

[5] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy

92.    Metro 2 guidelines require furnishers and CRAs to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are followed by both furnishers and CRAs.

93.    Within the Experian credit report Plaintiffs noticed that it reported the MidFirst mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as potentially discharged through bankruptcy, as derogatory, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured MidFirst mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the MidFirst Mortgage tradelines after the Bankruptcy was discharged. [6]

---

reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

[6] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

94.     Metro 2 guidelines require furnishers and CRAs to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are followed by both furnishers and CRAs.

95.     Within the Trans Union credit report Plaintiffs noticed that it reported the MidFirst mortgage account without the correct update that indicated that this secured debt was no longer part of the bankruptcy, as derogatory, as being in a wage earner plan and with references to the Chapter 13 Bankruptcy. The reporting is incorrect because Plaintiffs complied with the terms of the chapter 13 bankruptcy plan, were successfully discharged—excepted the secured MidFirst mortgage debt from being discharged, therefore, any remarks and/or references to Plaintiffs' chapter 13 bankruptcy should have been removed from the MidFirst Mortgage tradelines after the Bankruptcy was discharged. [7]

96.     Metro 2 guidelines require furnishers and CRAs to update the reporting of an account

---

[7] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any suppression codes associated with bankruptcy reporting for an account once the chapter 13 bankruptcy is discharged so that ongoing payments made by the consumer can be reported.

when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Metro 2 guidelines further require furnishers and CRAs to update the reporting of an account when the borrower associated to the account is discharged from chapter 13 bankruptcy by updating the CII to "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 Bankruptcy, and allows payments made by the consumer after the chapter 13 bankruptcy is discharged to be reported. Metro 2 guidelines are followed by both furnishers and CRAs.

97.     On or about July 2023, Plaintiffs sent direct disputes to Equifax, Experian, and Trans Union, and requested that the CRA Defendants investigate the reporting of the MidFirst mortgage account. Plaintiffs requested that under the FCRA, each CRA Defendant conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the MidFirst mortgage account.

98.     Within these dispute letters, Plaintiffs described in great detail the issues and the misreporting following their respective bankruptcies and enclosed copies of either their bankruptcy docket report, trustee final report, and/or discharge order. *See* Exhibits "F", "G", and "H".

99.     Equifax received Plaintiff Brad Pinzer's dispute on July 23, 2023. *See* Exhibit "I".

100.     Upon information and belief, Equifax did not respond to Plaintiff Brad Pinzer's dispute.

101.     Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 5, 2023 and within the Equifax credit report he noticed that the MidFirst tradeline

Page 22 of 40

continued to report the same inaccuracies. *See* Exhibit "J".

102.    Equifax responded to Plaintiff Erika Pinzer on August 2, 2023 and concerning the MidFirst tradeline made the corrections as all bankruptcy indicators were removed. Notably, this correction is in direct contrast to Equifax's response to Plaintiff Brad Pinzer as his MidFirst tradeline remained inaccurate. *See* Exhibit "K".

103.    Equifax's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiff Brad Pinzer's dispute and failed to remedy the inaccuracies within the MidFirst tradeline and gave no explanation as to why it failed to sufficiently update the MidFirst Mortgage tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

104.    Equifax's responses were not the result of reasonable investigations into Plaintiff's dispute for they did not adequately evaluate or consider his information, claims, or evidence and failed to remedy the inaccuracies within the MidFirst Mortgage tradelines.

105.    Plaintiff Brad Pinzer sent a very clear dispute, and yet Equifax made no changes to the disputed information, bankruptcy status, and/or account status.

106.    Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiff Brad Pinzer's MidFirst account.

107.    Upon his request to Equifax for verification and addition regarding the MidFirst mortgage account, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiff's information, claims or evidence. Importantly, Equifax failed to

maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiff with a response communicating the results. Further, Equifax did not make any attempt to substantially or reasonably verify the MidFirst Mortgage account.

108.    In the alternative, and in accordance with Equifax's standard procedures, Equifax failed to contact MidFirst, therefore, failed to perform any investigation at all.

109.    In the alternative to the allegation that Equifax failed to contact MidFirst, it is alleged that Equifax did forward some notice of the dispute to MidFirst, and MidFirst failed to conduct a lawful investigation.

110.    Experian received Plaintiff Brad Pinzer's dispute on July 22, 2023. *See* Exhibit "M".

111.    Upon information and belief, Experian did not respond to Plaintiff Brad Pinzer's dispute.

112.    Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 4, 2023 and within the Experian credit report he noticed that the MidFirst tradeline continued to report the same inaccuracies. *See* Exhibit "J".

113.    Experian received Plaintiff Erika Pinzer's dispute on July 22, 2023. *See* Exhibit "N".

114.    Upon information and belief, Experian did not respond to Plaintiff Erika Pinzer's dispute.

115.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 4, 2023 and within the Experian credit report she noticed that the MidFirst tradeline continued to report the same inaccuracies. *See* Exhibit "L".

116.    Experian's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the MidFirst

tradeline and gave no explanation as to why it failed to sufficiently update the MidFirst tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

117.    Experian's responses were not the result of reasonable investigations into Plaintiffs' disputes for they did not adequately evaluate or consider Plaintiffs' information, claims, or evidence and failed to remedy the inaccuracies within the MidFirst Mortgage tradelines.

118.     Plaintiffs sent very clear disputes, and yet Experian made no changes to the disputed information, bankruptcy status, and/or account status.

119.    Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' MidFirst account.

120.    Upon the Plaintiffs' request to Experian for verification and addition regarding the MidFirst mortgage account, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Experian failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Experian did not make any attempt to substantially or reasonably verify the MidFirst Mortgage account.

121.    In the alternative, and in accordance with Experian's standard procedures, Experian failed to contact MidFirst, therefore, failed to perform any investigation at all.

122.    In the alternative to the allegation that Experian failed to contact MidFirst, it is alleged that Experian  did forward some notice of the dispute to MidFirst, and MidFirst failed to

conduct a lawful investigation.

123.    Trans Union responded to Plaintiff Brad Pinzer on August 4, 2023 and deleted the MidFirst tradeline. *See* Exhibit "O".

124.    Plaintiff Brad Pinzer then obtained an updated copy of his three-bureau credit report on October 4, 2023 and within the Trans Union credit report he noticed that the MidFirst tradeline was indeed missing. *See* Exhibit "J".

125.    Trans Union responded to Plaintiff Erika Pinzer on August 4, 2023 and deleted the MidFirst tradeline. *See* Exhibit "P".

126.    Plaintiff Erika Pinzer then obtained an updated copy of her three-bureau credit report on October 4, 2023 and within the Trans Union credit report she noticed that the MidFirst tradeline was indeed missing. *See* Exhibit "L".

127.    Trans Union's responses, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the MidFirst tradeline and gave no explanation as to why it failed to sufficiently update the MidFirst tradeline when Plaintiffs filed chapter 13 bankruptcy, complied with the requirements of the chapter 13 bankruptcy plan, this loan was eventually transferred to MidFirst and the MidFirst loan was paid in full before they were successfully discharged.

128.    Plaintiffs sent very clear disputes, and yet Trans Union made no changes to the disputed information, bankruptcy status, and/or account status.

129.    Trans Union chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and inappropriately deleted / continued to publish the inaccurate information regarding Plaintiffs' MidFirst account.

130.    Upon the Plaintiffs' request to Trans Union for verification and addition regarding the MidFirst mortgage account, and in accordance with Trans Union's standard procedures, Trans Union did not evaluate or consider any of Plaintiffs' information, claims or evidence. Importantly, Trans Union failed to maintain procedures which would ensure that, if any investigation took place, it would provide Plaintiffs with a response communicating the results. Further, Trans Union did not make any attempt to substantially or reasonably verify the MidFirst Mortgage account.

131.    In the alternative, and in accordance with Trans Union's standard procedures, Trans Union failed to contact MidFirst, therefore, failed to perform any investigation at all.

132.    In the alternative to the allegation that Trans Union failed to contact MidFirst, it is alleged that Trans Union did forward some notice of the dispute to MidFirst, and MidFirst failed to conduct a lawful investigation.

## V.  GROUNDS FOR RELIEF

### COUNT I – EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. § 1681e(b))

133.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

134.    Equifax violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

135.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b)

(emphasis added).

136.    Plaintiffs furnished Equifax the necessary documentation supporting Plaintiffs' tradeline, yet Equifax continued to prepare a patently false consumer report concerning Plaintiffs.

137.    Despite actual and implied knowledge that Plaintiffs' credit reports were and are not accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiff's' creditworthiness.

138.    After Equifax knew or should have known Plaintiffs' account statuses in relation to their bankruptcy were inaccurate, they failed to make the corrections. Further, Plaintiffs did not request for any mortgage tradeline be deleted.

139.    As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

140.    Equifax's conduct, action, and inaction, were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

141.    The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT II – EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

142.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

143.    Equifax violated § 1681i by failing to update inaccurate information in the Plaintiffs'

credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

144.    As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

145.    Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

146.    The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**COUNT III – EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. § 1681e(b))**

147.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

148.    Experian violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

149.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a

consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

150.    Plaintiffs furnished Experian the necessary documentation supporting Plaintiffs' tradeline, yet Experian continued to prepare a patently false consumer report concerning Plaintiffs.

151.    Despite actual and implied knowledge that Plaintiffs' credit reports were and are not accurate, Experian readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiff's' creditworthiness.

152.    After Experian knew or should have known Plaintiffs' account statuses in relation to their bankruptcy were inaccurate, they failed to make the corrections.

153.    As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

154.    Experian's conduct, action, and inaction, were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

155.    The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT IV – EXPERIAN'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

156.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

157.    Experian violated § 1681i by failing to update inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

158.    As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

159.    Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

160.    The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.


### COUNT V – TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

161.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

162.    Trans Union violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports

and credit files it published and maintained concerning the Plaintiffs.

163.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

164.    Plaintiffs furnished Trans Union the necessary documentation supporting Plaintiffs' tradeline, yet Trans Union continued to prepare a patently false consumer report concerning Plaintiffs.

165.    Despite actual and implied knowledge that Plaintiffs' credit reports were and are not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiff's' creditworthiness.

166.    After Trans Union knew or should have known Plaintiffs' account statuses in relation to their bankruptcy were inaccurate, they failed to make the corrections. Further, Plaintiffs did not request for any mortgage tradeline be deleted.

167.    As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

168.    Trans Union's conduct, action, and inaction, were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

169.    The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT VI – TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

170.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

171.    Trans Union violated § 1681i by failing to update inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

172.    As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

173.    Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

174.    The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT VII – NATIONSTAR'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681s-2(b))

175.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

176.    Defendant Nationstar violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiffs' dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

177.    Nationstar further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Pacific Union and Nationstar representations within Plaintiffs' credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiffs' dispute(s) of the Pacific Union and Nationstar representations, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the Pacific Union and Nationstar representations to the consumer reporting agencies.

178.    As a result of Nationstar's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

179.    Nationstar's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

**COUNT VIII – MIDFIRST'S VIOLATION OF THE FCRA**

Page 34 of 40

**(15 U.S.C. §1681s-2(b))**

180.    The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

181.    Defendant MidFirst violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiffs' dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

182.    MidFirst further violated 15 U.S.C. § 1681s-2(b) by continuing to report the MidFirst representations within Plaintiffs' credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiffs' dispute(s) of the MidFirst representations, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the MidFirst representations to the consumer reporting agencies.

183.    As a result of MidFirst's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

184.    MidFirst's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

## VI.  VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

185.    Plaintiffs will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondeat superior and/or vicarious liability.


## VII. DAMAGES

186.    Plaintiffs respectfully request that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws, including Texas.

187.    Plaintiffs respectfully request that this Honorable Court award Plaintiffs their litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

188.    The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiffs.

189.    Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiffs and have been a substantial factor in causing credit denials and other damages.

190.    Plaintiffs suffered a variety of damages, including economic and non-economic damages as prayed for herein.

191.    Defendants have negligently and/or willfully violated various provisions of the FCRA, and are thereby liable unto Plaintiffs.

192.    Defendants are liable unto Plaintiffs for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to, out-of-pocket expenses, credit denials, costs and time of repairing their credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, attorney's fees, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiffs, Brad and Erika Pinzer, pray that this Honorable Court:

A.    Enter Judgment in favor of Plaintiffs and against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, Nationstar Mortgage LLC, successor by merger to Pacific Union Financial, LLC, and MidFirst Bank jointly, severally, and in solido, for all reasonable damages sustained by Plaintiffs, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing their credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and common law;

B.    Find that the appropriate circumstances exist for an award of punitive damages to Plaintiffs;

C.      Award Plaintiffs pre-judgment and post-judgment interest, as allowed by law;

D.      Order that the CRA Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, and Furnisher Defendants, Nationstar Mortgage LLC, successor by merger to Pacific Union Financial, LLC and MidFirst Bank work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data emanations, consumer histories, and credit histories of and concerning Plaintiffs and/or any of Plaintiffs' personal identifiers.

E.      Grant such other and further relief, in law or equity, to which Plaintiffs might show they are justly entitled.

Date Filed: <u>November 30, 2023</u>

Respectfully submitted,

<u>/s/ Matthew P. Forsberg</u>
Matthew P. Forsberg
TX State Bar No. 24082581
Matt@FieldsLaw.com
FIELDS LAW FIRM
9999 Wayzata Blvd.
Minnetonka, Minnesota 55305
(612) 383-1868 (telephone)
(612) 370-4256 (fax)

LAW OFFICE OF JONATHAN A. HEEPS

<u>/s/ Jonathan A. Heeps</u>                   .
Jonathan A. Heeps
TX State Bar No. 24074387
LAW OFFICE OF JONATHAN A. HEEPS
Post Office Box 174372
Arlington, Texas 76003

Telephone (682) 738-6415
Fax (844) 738-6416
jaheeps@heepslaw.com


COUNSEL FOR PLAINTIFFS

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.

<u>November 30, 2023</u>                    <u>*/s/ Matthew P. Forsberg*   </u>
Date                                            Matthew P. Forsberg